Our next case will be Daniel Lewis versus the Superintendent of Phoenix SCI, that's all. Good morning, Professor. Good morning. This is Gordon. I'm here with the Thomas R. Fine School of Law at Duquesne University, Federal Litigation Specialist. We're very grateful to the court, again, for the work and the help and Luke Boxman, who will present. Thank you very much. So I'm assuming, Ms. Gorman, you will go first. Is that right? Whenever you're ready. Good morning. Good morning, Your Honors. Before I begin, can I reserve two minutes for rebuttal?  My understanding your colleague will present rebuttal argument. Is that right? Correct, Your Honor. May it please the court. Kelsey Gorman on behalf of Helen Daniel Lewis. In front of this court today is a case that was an evidentiary close call, where an unconstitutional reasonable doubt instruction impaired the jury's verdict and ultimately denied Daniel Lewis a fair trial. This court will conduct a de novo review of the record for the ineffective assistance of counsel claim. Such ineffective assistance of counsel claims are guided by Strickland versus Washington and its two prongs. The first prong requires a showing that trial counsel was deficient. In the government's brief on page 24 and 23, it called this instruction erroneous four times, and it conceded that trial counsel should have objected to this instruction. Further, seven district courts in Pennsylvania have found this instruction to be unconstitutional. So today our focus is on the second prong, which is a reasonable probability, but for counsel's unprofessional errors that the result of the proceeding would have been different. So it's the prejudice prong of Strickland, right? Exactly, Your Honor. What is the prejudice here? The prejudice stems from this unconstitutional reasonable doubt instruction. As I will get to, there were two witnesses in this case, both of which were inconsistent, both of which were unreliable. When the jury then went to deliberate, they had the incorrect standard of proof on their mind. They were given a very emotional and weighty instruction that impaired their ability to consider this evidence in a fair light, which ultimately denied the appellant a fair trial. Instruction wrong, or was the instruction confusing? I would say that it was both, Your Honor. So getting into the instruction briefly, it appears on JA0545, and in this instruction, Judge Hughes says that the jury should think of their most precious loved one, and then imagine that this most precious loved one has a terminal illness with only one shot at survival. That shot at survival is an extremely experimental surgery. She then describes everything that she would do to make sure that this surgery was the right choice. After doing all of that research, calling every doctor she knows every possible solution, only then would she move forward with choosing the surgery. I would like to point to two Supreme Court cases that illustrate why this is problematic. The first is Cage v. Louisiana. There, the Supreme Court held that reasonable doubt cannot be a reference to moral certainty. Rather, it should be an evidentiary standard. An emotional instruction risks suggesting a higher level of doubt to the jury than is actually necessary. The second is Holland v. United States, which says that the reasonable doubt instruction should be framed as a hesitation to act. Here, Judge Hughes said that if you go forward with surgery, so she had it flipped. This was also couched in between standard jury instructions. So she gave the standard instruction at the beginning and the end. Now naturally, we are going to cling on to the most emotional, dramatic aspect, which is what the jurors in this case likely did. So for these reasons, the instruction was both confusing and incorrect with Supreme Court precedent. Now, I would like to begin by addressing this court's order on April 8th regarding mental state evidence. Your honors, our position has consistently been that this case was a close call. There is a reasonable probability that this case could have supported a third degree conviction. It is important to remember is that what's that probability? It seems to me that when I look at this case, this case was always litigated in the state courts on the basis that Lewis didn't do it. Correct? Correct, your honor. However, I would point to a few parts of the record. First on JA-0466, Judge Hughes agrees that the evidence in this case is quote sufficiently ambiguous, and she supports giving a voluntary manslaughter charge as well. And then on JA-0434, that is Detective Verrecchio's testimony as to his conversation in the hospital with Lewis. And in that conversation, it comes up twice that the victim, Stephen Bates, was armed and that he shot at Lewis first. So although this might not have been necessarily pursued by trial counsel, trial counsel was arguing this on the merits of Lewis didn't do it, there was still evidence that was considered and heard by the jury that could have suggested third degree. And there was the possibility for the jury to come back with a third degree conviction. But wasn't the entire dispute at trial about whether he did it or not? It doesn't seem like this was argued in terms of mental state. And indeed, the evidence seems to be the victim was shot in the back, making it kind of hard to make an argument that this was imperfect self-defense. Sure, your honor. I would like to reference again that the jury heard evidence of this self-defense as imperfect or perfect as it may be. They heard it and they considered it. They actually came back to ask the difference between first and third degree murder, which shows that they were considering it to a certain extent, even if that wasn't the ultimate strategy pursued by trial counsel. I would like to move on to some of the case law on this issue as well. So the 2021 case by this court in Baxter versus Superintendent Cole is binding authority. However, it should not be controlling under these facts. Baxter stands for a distinct factual situation where the evidence against the defendant is overwhelming. If I could briefly bring up some of that evidence that was present in Baxter, there were various eyewitnesses who knew Baxter for years, who were in close proximity of the shooting and actually saw it happen and could testify to that fact. Also, Baxter was only ever charged with first degree murder. So there wasn't this sort of mental state evidence that was coming in as well. The evidence here just simply cannot be said to be overwhelming. Instead, we should look to Moore versus Ravello, which is a 2022 case out of the eastern district of Pennsylvania. Now, this is not binding on this court. However, it should be considered extremely persuasive authority because the facts are so similar. Is that a pre-Baxter case? So it was actually post-Baxter. The issue in that case was whether in light of Baxter, Moore had suffered actual prejudice. So it is very on point for this matter. If I could quickly point to what was present in Moore, there were three self-described eyewitnesses, none of which were actually at the scene of the crime. They were around the neighborhood. They were all using drugs and alcohol at the time. They all said on the stand that they could not remember what they actually saw. And the court found actual prejudice under these circumstances. In that case, there were three witnesses. And didn't two of them recant their testimony during trial? Correct, Your Honor. It's a little bit different. Neither Ford nor Miller recanted their testimony during trial in this case. That is correct, Your Honor. While they did not explicitly recant, I would push back and say that their testimony was so inconsistent that they really did not have a clear narrative as to what they were speaking about. So getting to these, may I briefly conclude?  So getting to these two eyewitnesses, Athena Ford, she was outside of the home. She was not actually observing the shooting. She said on the stand at JA-0267 that she was not testifying from her own memory. She did not know what she remembered. Instead, she was testifying as to what she heard around the neighborhood. And then on JA-0411, Daniel Miller, the second witness, who was down the block. He was not even in close proximity. He does not know if his statement that he ultimately gave to police was primed or not. So for these reasons, Your Honor, we believe that we should be distinguished from Baxter. We should be more comparable to Moore. And there should be a finding of actual prejudice because of this unconstitutional jury instruction. And for that, Daniel Lewis's writ of habeas corpus should be granted. Thank you. I think we need to hear from the government before we hear from you. Thanks. He's rebuttal. That is it. Are you on the merits also? Yes. I'm sorry. My mistake.  Sorry, guy. I thought you were strictly rebuttal. Good morning, Your Honors. May it please the Court. The second issue presented before you today is whether or not trial counsel was ineffective as a result of his failure to renew a motion to recuse in light of the trial judge's conduct, which was pervasive throughout trial. Before proceeding further, I'd like to first point out a few instances of the record that indicate Judge Hughes's conduct. Who heard those comments? The comments that I'm about to get into. Specifically, did the jury hear these comments that are attributed to the judge? So the comments in which Judge Hughes called Daniel Lewis a psychopath occurred in chambers while they were discussing whether or not to admit a seized writing. Our stance on that issue is that it doesn't matter that these comments occurred in chambers because trial counsel was present. He was participating in it. Well, rather, not participating. And he was standing idly by. And while he was standing by, the judge said on JA-0481, Daniel Lewis is a flipping psychopath. He's a flipping psychopath. And then he says, then she goes further to say, these are the writings of a sick human being. But what should, at that point, what should counsel have done? Trial counsel should have renewed his earlier motion to recuse at that point. At the start of the trial, if we look to JA-0170, we can see we start the second jury trial with an initial motion to recuse. But if we look at how he asks for it, there's really no teeth to it. Is the standard whether the recusal motion would have succeeded for prejudice or whether there was just good cause to make such a motion? Because that's a really, recusal motions are very hard to win. Naturally. Naturally, Your Honor. So the standard under Strickland is what a reasonable, reasonably competent attorney would do. And that's the performance standard. But there's also prejudice. There's two prongs to Strickland. Correct. Okay. So even if a reasonably competent attorney would have made it, which is iffy if you can't show that it'll win. Like, where's the prejudice if it wouldn't have affected the outcome, if it would ultimately have been denied? Well, the prejudice is the same. And it's what we're arguing here today that Lewis was deprived of a trial before a neutral jurist or a jurist whose objective objectivity and impartiality could be reasonably questioned. Almost like a spillover that she was so hostile to this particular individual that it tainted the jury instructions. In much the same way, Your Honor. That is, I believe, what the government cites in Commonwealth v. English. That is essentially something that Pennsylvania Supreme Court holds there. Now, in that case, those comments were directed directly towards counsel and not towards the appellant. We think that this is a step above that because we have a judge on the record saying that a man who is presumed innocent until proven guilty, she's calling him a psychopath. She's saying he is a sick human being. Those are not terms that you use when you can have a neutral affect towards someone. So is this an appearance of bias case? I think it supports both, Your Honor, based on the severity and the strength of the language she uses. If I can continue, Judge Hughes also takes multiple attempts at altering the trial transcript. Now, we're here on Appellate Review. We all recognize the importance of having a complete and preserved record for the issue of preserving appeals. And she takes her own comments out of the record. This is not something that is new for Judge Hughes. In fact, if we look to Commonwealth v. Daugherty, she had previously called a PCRA defendant vile and then had that discreetly removed from the record. When the Pennsylvania Supreme Court heard that case, Justice Barron, concurring a statement, said, to alter the trial transcript is to strike at the meaningful heart, meaningful pillars, rather, of Appellate Review. He also goes so far as to say that altering the trial transcript is reprehensible and should be universally condemned. I believe he also makes an analogy. If any lawyer was found to be altering the official trial transcript discreetly off the record, let alone removing one of his own remarks where she insults the client or the judge, severe repercussions would follow. So these are not the remarks of a colorful jurist. This is a sustained pattern of conduct. This court also has recognized the clear importance of keeping a clean trial record. In fact, the absolute absence of one renders your claim default, as this court held in United States v. Maya. The prejudice that resulted from trial counsel's failure to act is that Lewis was able to proceed to trial before a jurist whose impartiality could be reasonably questioned. Now, under the second prong of Strickland in McKernan v. SCI Smithfield, this court held that the standard for the second prong of Strickland is that prejudice is, to prove to the evidence standard, less than a civil trial. Here, we think that is clear because if you look at Lewis's first trial, it resulted in a hung jury. That was before a different judge. I also like to take some wisdom from the Supreme Court here that bias is easy to attribute to others and difficult to discern in oneself. So I think Judge Bibas got to that a little bit. It is very difficult to prove a motion to win on a motion to recuse. That's because it is a reviewable decision. However, when the conduct of this rises to this level, trial counsel has that duty to make that motion to recuse. They are there to zealously advocate for their client, and trial counsel should have done so here. But let's go back. Having not done so, what's the actual prejudice? Prejudice is the failure to do so. Failure to do so is that it was never noted for the record a renewed motion to recuse. So the initial one without any teeth that I referred to earlier was never noted for the record. Everyone subsequently reading this never knew that trial counsel made or could have made a subsequent motion. So it was never brought up in a state court. It was immune to review at that point. Could counsel have been thinking, look, if I ask her to recuse now, she's just going to be more hostile to my position. So I'm not going to do that as a strategic decision. I would say no, Your Honor, because it's not a strategy. It's not the trial, the counsel's job to keep the judge happy. They are there to zealously advocate with their client, and trial counsel here failed to do so. Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the court. Emily Horwitz for the Commonwealth. Mr. Lewis received effective assistance of counsel, and this court should affirm the district court. This case can be resolved on prejudice, and Mr. Lewis has not shown he was prejudiced. The evidence of Mr. Lewis's guilt was strong and interlocking, and there's not a reasonable probability that the jury would have convicted Lewis of anything other than first-degree murder, as none of counsel's actions affected the evidence the jury heard. What do we make of the fact that the first trial ended in a hung jury? Yes, Your Honor, there were substantial differences in the evidence between the first and second trials. These two main differences were the live testimony of Athena Ford, and what we call the all rats must die note. So starting with the live testimony of Athena Ford. She's one of the eyewitnesses who saw Daniel Lewis run into her house at 3 a.m. with a gun, run out, and then her three gunshots run out, and then saw Mr. Bates walk down the stairs, collapse on the ground. At the first trial, all the jury heard from her was her preliminary hearing testimony that was read into the record. The jury didn't know why she wasn't there, and that testimony read into the record was about 31 pages of the notes of testimony, not a lot of time. At the second trial, on the other hand, Athena Ford was there. She testified for an extensive period of time. Her testimony was about 135 pages of the notes of testimony. The jury had multiple opportunities to observe her credibility, to see her look at Mr. Lewis in the courtroom and say, yeah, that's the guy who ran into my house at 3 in the morning. That's the guy who shot Stephen Bates. That's the guy who I'm afraid of, who I think is going to kill me. And that evidence alone is extremely valuable for the jury to determine, oh, well, this woman was here. This was her house. She saw what happened. Now, in terms of Daniel Miller and this all-rats-must-die note, Daniel Miller also testified that he saw Lewis run by him with a gun in his hand around 3 in the morning and said, you know, get lost, and then ran back about five minutes later. At the first trial and at the second trial, Daniel Miller said that he didn't identify Daniel Lewis at first because he was scared of being labeled a snitch. And at the first trial, you know, the jury might have thought, well, if you're scared of being labeled a snitch, why the heck are you here? Like, he sees you. But at the second trial, the jury heard these four and a half lines from this all-rats-must-die writing saying, and I quote, I can't wait to get my hands on this rat ass, end word, Trife said to himself out loud as he read the statement that Fat Donny gave on him. Trife had been locked up for two years and still felt a lot of rage for Fat Donny snitching on him. The prosecutor observed in her closing argument that Daniel Miller is a pretty fat guy. He had a big gut. So the jury could have seen pretty easily that this writing, Troy Trife, was one of Lewis's nicknames, was about how mad that he was at Daniel Miller for seeing him and telling the truth. So at the first trial, maybe the jury thought, hmm, this one witness isn't here. This other witness is, you know, he's afraid of snitching. This is kind of weird. But at the second trial, the jury heard words from the defendant's own mouth saying, yeah, Daniel Miller saw me and I'm really mad that he saw me and told the cops. And that lined up with Daniel Miller's testimony and Daniel Miller's testimony lined up with Athena Ford's live testimony. So when you have these two live witnesses pointing at Lewis and saying he was the shooter and this note, all of a sudden these witnesses become so much more credible. And as your honors observed, this case has only ever really been litigated as an identification case. So the first trial, maybe there's a little bit of doubt here. I mean, obviously there was some doubt. It was a hung jury. But at the second trial, now that you have these three interlocking pieces of evidence, Ford's live testimony, Miller's live testimony, the all rats must die note where it's acknowledged that Miller was telling the truth, that doubt about who the shooter was absolutely went away. Well, the other variable is a different judge, right? And you would agree she expressed some real hostility towards the defendant, would agree? Yes, your honor. You agree there was a problem with the jury charge? Yes. But your honor, as your honors observed previously, none of these remarks that are less than judicial and judge Hughes should not have made, none of them were made in front of the jury. And this was a jury trial. So Lewis hasn't argued that anything that judge Hughes did affected the evidence that came in against him. So when the jury's not hearing these remarks. What about affecting the jury charge? Did it affect the reasonable doubt charge? Well, your honor, the reasonable doubt charge was improper. But at the end of the day, this case was not about reasonable doubt. Other cases where the Eastern District of Pennsylvania has found that a petitioner has shown prejudice are cases where reasonable doubt played a fundamental role in the deliberations. At the second trial, reasonable doubt didn't play a role at all. You had these two witnesses plus the defendant's own statements. Reasonable doubt plays a role in every criminal case. Yes, your honor. But it was because of the substantial interlocking nature of the evidence and the fact that Lewis told police in the hospital, I went there and I did what I had to do. So there was so much evidence here. There's really not a reasonable probability that a jury hearing the same evidence they heard at the second trial would have found Lewis guilty of anything other than first degree murder. Because again, this is a ineffective assistance of counsel claim. Lewis has to show prejudice in order to win on this claim. And even though we agree this instruction was confusing and unconstitutional, at the end of the day, there was strong interlocking evidence of Lewis's guilt that he did commit first degree murder. So the erroneous instruction did not prejudice him.  On the recusal failure to make the recusal motion. Yes, your honor. You're familiar with the case in McKernan versus Superintendent. And in that case, we said that the prejudice prong for an ineffective assistance claim was easy to fulfill where the deficient performance was the failure to renew a recusal motion. So if prejudice was easy to show there, is it easy to show here as well? No, your honor. These cases are distinguishable on the facts for a few reasons. So first, McKernan was a bench trial. This was a jury trial. So of course, it's of no moment in a bench trial whether the jury hears comments or not. There's no jury. Second, the comments in McKernan were egregious. The judge in McKernan brought the victim's family back into the roving room along with counsel for both parties, recognized that the victim's family had written some blog about her criticizing some of her actions and said to the family, like, I want to make sure that you're happy with my performance as a judge. That's completely inappropriate. And the fact in that case, too, that the judge recognized she might have some issues with impartiality, which the Pennsylvania Supreme Court has recognized and Stevenson, I believe, is a valid basis for recusal. The prosecutor acknowledged this judge might have some issues and counsel still went ahead and advised his client. Yeah, I think you're fine. She's a good judge. But on prejudice specifically there, the defense theory of the case was that the defendant was only guilty of a lesser degree of homicide. And the allegation of bias in that case was that the judge, the victim's family had called the judge, let him loose, Lisa, and she didn't want to be seen as a soft judge. So there there's a really direct link between this potential bias and the potential prejudice because you have a judge that basically told the family, you know, I want to make sure you have a fair case. I want you to be happy with me. I see that you, you know, want me to convict this guy of first degree murder, even though there's substantial evidence on the record in that case that did support a lesser degree of homicide. It's pretty serious, though, to have the judge in this case called the defendant a psychopath. And yes, your honor, that is not a great comment to make. But what's very important here is that immediately after referring to Mr. Lewis as a psychopath or a sick human being, she took a step back, considered the evidence and the proffered purpose, and then severely limited what the Commonwealth could introduce in rebuttal. So she recognized, I think, sharing with this jury his fantasy of what he would do to Daniel Miller with a bottle of water and a taser gun would traumatize this jury and would just eviscerate any possibility of a fair trial, said J.A. 484. So, sure, Judge Hughes had an emotional outburst in a stressful proceeding, worded out that he was a psychopath, but then immediately said, OK, well, if the jury reads this, hears this, that has, you know, doesn't have anything to do with the exact facts of the case, doesn't go through what happened in the shooting, the jury is going to think he's a psychopath and the jury is going to convict him of first degree murder no matter what. And that's going to deprive him of a fair trial. So the fact that Judge Hughes said some things that were not advisable outside the presence of the jury, but then limited what the jury could hear so that they would stay focused on the facts of the shooting itself, really showed that she was not biased. Did she try to clean up the record? Your Honor, she made two asides to her court reporter that, in the whole context of the And regardless, that's not appropriate for a judge to do. But looking at kind of the circumstances of what happened with these two comments, the Bull comment was really just Judge Hughes acknowledging that she'd used potentially profane language in the record in expressing her exasperation with counsel for repeatedly, repeatedly raising an objection that she had already ruled on. And it seems from the record that nobody took this seriously as the remark was not deleted. And then the I'll kill you comment during the charge conference. In light of all of her remarks, this was really just a joke. She said, I'll kill you. Then she said, I'll take that out of the record. Then she said, I'll kill you again. This was at the end of a long trial. A long day of trial was made to both attorneys. And then a few minutes after that, she said, counsel, now, before I shoot the two of you, get out of here. So all in all, these remarks show that she was not seriously intending to take anything of the record. And what's more is that she did repeatedly recognize throughout the trial the importance of preserving the record for appellate review. So she didn't attempt to take anything out that was like substantive or would affect Lewis's appellate rights. On the other hand, she really wanted to make sure that she understood the nature of every objection that was made by either party and got it into the record so that she could protect Mr. Lewis's rights in whatever proceedings might happen after. All right, your honors, if there's no further questions, the Commonwealth requests that this court affirm the district court in holding that Mr. Lewis did not receive ineffective assistance of counsel. Thank you. Now we'll hear your rebuttal. May it please the court. I have two brief points I'd like to make on rebuttal here today. Reasonable doubt is the lens through which all evidence in a criminal prosecution can be viewed through. Whenever you have a judge that starts to repeatedly add in emotional remarks and basically instructs the jury to move rather than to hesitate from acting, you start putting a filter on that lens and the jury cannot adequately then go forward and make a deliberation that should be constitutionally upheld. And in this regard, we have evidence that could have supported first and could have supported third to address the confession. As part of that confession, he also says, I was shot at first, then I did what I had to do. So insofar as that is a confession of what he had to do, it could just as well represent self-defense. I would like to say another difference between the first and second trial is that Athena Ford was not present for the first trial. So her preliminary hearing testimony is going to be more consistent there because it's just being read into the record. So any indication that it would be more or less indicative of her at trial is wholly muted by the fact that she wasn't present and her testimony was just straight read into the record. As to issue two, the comments in McKernan were egregious. However, our position is that calling in a litigant, a sick human being, and a psychopath are also sufficiently egregious, irrespective of whether or not they occur before a jury. Criminal judges are bound to hear all manner of things and see all manner of evidence that might be shocking to them, but it is not their duty to take a position based on the perceived litigant. And this was not a one-off remark. I would point to JA0482 and say, Judge Hughes said, again, I reinforce my position that this man is a psychopath. This is not a one-off remark. A trial judge is charged with discharging their duties neutrally and impartially, and Judge Hughes failed to do so here. As a result, trial counsel should have requested their accusal and was sufficiently prejudiced for failing to do so. Thank you. Thank you, Your Honors. Thank you, Counsel. And a lot of thanks to Duquesne and the Klein School of Law and your students and your professor for your good work here. Thank you very much.